FILED

IN THE UNITED STATES DISTRICT COURT UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO

FOR THE DISTRICT OF NEW MEXICO

JUN 0 9 2003

KHALEHA CLARK,

Plaintiff,

vs.                                              CIV No. 02-0206 BB/WDS

JO ANNE B. BARNHART, Commissioner
of the Social Security Administration,

Defendant.

## MAGISTRATE JUDGE'S PROPOSED
## FINDINGS AND RECOMMENDED DISPOSITION

**THIS MATTER** came before the Court upon Plaintiff's Motion to Reverse or Remand the

Administrative Agency Decision, filed July 8, 2002 **[docket # 7]**. Latoya Clark brought this action

on behalf of her minor daughter, Khaleha Clark, who was born on April 29, 1999. She seeks judicial

review of a final decision of the Commissioner of Social Security, who determined that Khaleha was

not eligible for child supplemental security income benefits. For the reasons stated below, the United

States Magistrate Judge, having considered the Motion, memoranda, administrative record, and

applicable law, recommends that the Motion be **GRANTED IN PART.**

### PROPOSED FINDINGS

1.    *On June 30, 1999, Latoya Clark ("Ms. Clark") filed an application for supplemental*

security income benefits ("SSI") on behalf of her daughter, Khaleha Clark ("Khaleha"). **Tr. at 54-71.**

Ms. Clark alleged in her application that Khaleha had been disabled since her birth on April 29, 1999

due to a condition known as urea cycle defect. **Tr. at 54, 62.**

2.    Khaleha's application was denied at the initial level on August 2, 1999, **Tr. at 40-45,**

and at the reconsideration level on November 12, 1999, **Tr. at 47-50.** Ms. Clark appealed by filing



a Request for Hearing by Administrative Law Judge ("ALJ") on December 29, 1999.  **Tr. at 51.**

      3.      The ALJ held a hearing on December 8, 2000, at which Ms. Clark and Khalcha appeared and were represented by a non-attorney.  **Tr. at 24.**  In a decision dated April 26, 2001, the ALJ denied Khaleha SSI benefits.  **Tr. at 7-19.**

      4.      Ms. Clark filed a request for review with the Appeals Council on July 10, 2001.  **Tr. at 6.**  The Appeals Council denied Ms. Clark's request for review on January 9, 2002, **Tr. at 4-5,** and thereby rendered the ALJ's decision the final decision of the Commissioner of Social Security ("Commissioner"), **Tr. at 4.**  *See* 20 C.F.R. § 416.1481 (2003).

      5.      Plaintiff filed this action on February 21, 2002 in which she seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 1383(c)(3).  On February 28, 2002, the matter was referred to a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) for a recommended disposition.[1]

      6.      On January 22, 2002, Ms. Clark filed a second application for SSI benefits on Khaleha's behalf.  *See* Mem. Br. in Supp. of Pl.'s Mot. to Rev. or Remand, Ex. B.  That application resulted in an award of SSI benefits at the initial level.  *Id.*  Accordingly, this case only involves the question of entitlement to benefits for the period from the initial application on June 30, 1999 until Khaleha began receiving benefits in February, 2002.

---

[1]The case was initially referred to Judge Deaton, but was subsequently referred to the undersigned United States Magistrate Judge.

## Standard of Review

7.    This Court's review of the Commissioner's findings is limited to the following:

a.    First, the Court determines whether the Commissioner's findings are supported by substantial evidence in the record. *Andrade v. Secretary of Health & Human Servs.*, 985 F.2d 1045, 1047 (10th Cir. 1993). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988)) (additional citations omitted). In determining whether the Commissioner's findings are supported by substantial evidence, the Court does not undertake a *de novo* review of the evidence. *Sisco v. U.S. Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993). The Court should not re-weigh the evidence, nor should it substitute its judgment for that of the Commissioner. *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994). Instead, the Court should meticulously examine the entire record to determine if the Commissioner's decision is supported by more than a scintilla, but less than a preponderance, of evidence. *See Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988); *Sisco,* 10 F.3d at 741.

b.    Second, the Court determines whether the Commissioner applied the correct legal standards. *Andrade,* 985 F.2d at 1047. "The failure to apply the correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal.'" *Id.* (quoting *Byron v. Heckler,* 742 F.2d 1232, 1235 (10th Cir. 1984)) (additional citations omitted).

8.    To be eligible for SSI benefits, a claimant's income and financial resources must fall below a certain level, and he or she must meet the statutory definition of an "aged, blind or disabled" person. *See* 42 U.S.C. § 1382(a). A claimant who is less than eighteen (18) years old is considered

3

disabled if he or she "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(C)(i).

9.   A sequential three-step process is applied in determining whether a child is disabled. *Brown v. Callahan,* 120 F.3d 1133, 1135 (10th Cir. 1997). First, the Commissioner determines whether the child is engaged in substantial gainful activity. 20 C.F.R. § 416.924(a) (2003). If so, the child is not disabled. *Id.* If not, the Commissioner proceeds to the second step, which is to determine whether the child's physical or mental impairment, or combination of impairments, is severe. *Id.* If the child's impairment or combination of impairments is not severe, the child is not disabled. *Id.* If the severity requirement is satisfied, the Commissioner proceeds to the third step, in which he or she determines whether the child's impairment, or combination of impairments, meets, medically equals, or functionally equals an impairment listed in Appendix 1, Subpart P, of 20 C.F.R. Part 404 ("Listings" or "Listed Impairment"). *Id.* If so, and if the durational requirement is satisfied, the child is entitled to SSI benefits. *See id.*

10.   For purposes of the third step in the sequential analysis:

a.   In order to "meet" a Listed Impairment, a child's impairment should "be established on the basis of medically acceptable clinical and laboratory diagnostic techniques." *See* 20 C.F.R. § 416.925(c) (2003). If stated in the Listing, specific medical findings may also be required to establish a diagnosis or confirm the existence of a Listed Impairment. *Id.*

b.   In order to "medically equal" a Listed Impairment, the medical findings must be "at least equal in severity and duration to the listed findings." 20 C.F.R. § 416.926(a) (2003). In

4

making this determination, "symptoms, signs and laboratory findings" about the child's impairment are compared "with the corresponding medical criteria shown for any listed impairment." *Id.*

c.      In order to "functionally equal" a Listed Impairment, a child's impairment or combination of impairments must result in an "extreme" limitation in one domain of functioning, or must result in "marked" limitations in two domains of functioning. 20 C.F.R. § 416.926a (2003). The six domains of functioning that are assessed are "(i) Acquiring and using information; (ii) Attending and completing tasks; (iii) Interacting and relating with others; (iv) Moving about and manipulating objects; (v) Caring for yourself; and (vi) Health and physical well-being." 20 C.F.R. § 416.926a(b)(1) (2003).

### Facts Relating to Khaleha's Impairment

11.      Khaleha was born on April 29, 1999. **Tr. at 28.** She was born at Clovis High Plains Hospital in Clovis, New Mexico, and was discharged when she was one-day-old. **Tr. at 478.** However, Khaleha was re-admitted to the hospital in Clovis the following day because she was lethargic and was not feeding well. **Tr. at 116.** While hospitalized in Clovis, Khaleha began experiencing seizures. **Tr. at 116.** An endotracheal tube was placed in Khaleha's airway, and she was transferred to a hospital in Lubbock, Texas. **Tr. at 116.** After certain medical tests were performed in Lubbock, Khaleha was transferred to the Newborn Intensive Care Unit at the University of New Mexico Hospital ("UNMH") on the evening of May 2, 1999. **Tr. at 116, 117.** She remained at UNMH until she was discharged on May 14, 1999. **Tr. at 116.**

12.      UNMH physicians diagnosed Khaleha's condition as arginine succinate lyase deficiency, which is also known as argininosuccinic acidura or urea cycle defect. **Tr. at 118, 217, 435, 472.** In persons who have this condition, the body is unable to convert ammonia, which is a

toxic substance produced when digesting protein, into a non-toxic substance called urea. **Tr. at 474.**
As a result, ammonia accumulates in the blood and spinal fluid. **Tr. at 474.** Ammonia is particularly
toxic to the brain, and excess levels cause the brain to swell in the skull. **Tr. at 474.** Swelling of the
brain produces a life-threatening condition known as cerebral edema. **Tr. at 474.**

13.     All persons affected with urea cycle defect have some degree of mental retardation,
which is usually severe to profound. **Tr. at 435.**

14.     Khaleha's elevated ammonia levels at the time of her birth damaged her developing
brain. **Tr. at 435.** As a result, Khaleha was delayed in attaining developmental milestones and may
have suffered residual cognitive damage. **Tr. at 435.**

15.     The accumulation of ammonia that results from urea cycle defect can be controlled
with a strict, low-protein diet and supplementation with arginine and a medical food product. **Tr. at
217, 474.** However, urea cycle defect is a lifelong condition that must be monitored by a metabolic
specialist, **Tr. at 435, 477,** as persons with this condition periodically experience episodes of elevated
ammonia levels and remain at risk for additional cognitive damage. **Tr. at 435.** Although the degree
of damage caused by these episodes depends upon the level of ammonia that accumulates and the
length of time that ammonia levels remain elevated, the resultant damage is cumulative. **Tr. at 435.**

## The ALJ's Decision

16.     In the first step of the sequential three-step analysis used to determine whether
Khaleha is disabled, the ALJ found that Khaleha, who was nineteen-months-old at the time of the
hearing, had never engaged in substantial gainful activity. **Tr. at 11.**

17.     At the second step of the analysis, the ALJ found "that Khaleha has impairments,
which cause more than minimal limitations in age-appropriate functions. [Khaleha], therefore, has

6

a severe impairment." **Tr. at 11.**

18.    In the third step of the analysis, the ALJ found that Khaleha did not have an impairment or combination of impairments that met, medically equaled, or functionally equaled the criteria of any of the Listed Impairments. **Tr. at 12-18.** More specifically:

a.    The ALJ found that the Listings set forth at Sections 110.07 and 112.05 applied to Khaleha's impairment, or combination of impairments, resulting from urea cycle defect. **Tr. at 12,13.** However, the ALJ concluded that Khaleha's impairment, or combination of impairments, did not meet or medically equal the requirements of either Section 110.07 or 112.05. **Tr. 12,13.**

b.    After finding that Khaleha's impairments did not meet or medically equal any Listed Impairment, the ALJ conducted an analysis as to whether Khaleha's impairments "cause limitations that are functionally equivalent to the limitations found in any listed impairment." **Tr. at 13.** He concluded that Khaleha did not have marked or extreme limitations in any of the six domains of functioning, and, therefore, found that Khaleha did not have "functional limitations that are equivalent to a listing." **Tr. at 18.**

### Issues on Appeal

19.    Plaintiff's first contention is that the ALJ erred when he failed to find that, in addition to her severe urea cycle defect, Khaleha has several other impairments that are severe.  According to Plaintiff, the ALJ erroneously focused on Khaleha's urea cycle impairment when he should have found that Khaleha has severe impairments based on multiple body dysfunction, organic mental disorder, mental retardation and developmental disability.

20.    Second, Plaintiff contends that the ALJ erred when he failed to find that Khaleha's

7

impairment, or combination of impairments, met the Listed Impairments set forth at Sections 110.07, 112.02, and 112.05.

21.    Third, Plaintiff contends that the ALJ erred when he failed to find that Khaleha has impairments that are functionally equivalent to a Listed Impairment. Plaintiff contends that the ALJ should have found that Khaleha has marked to extreme limitations in the domains of acquiring and using information, and moving about and manipulating objects.

## Analysis

### Issue One:  The ALJ's Finding That Khaleha Has A
### Severe Impairment Is Supported By Substantial Evidence

22.    Although the ALJ found at step-two of the analysis that Khaleha "has urea cycle defect impairment, which is severe," **Tr. at 19,** Plaintiff contends the ALJ erred when he failed to consider Khaleha's other impairments.  More specifically, Plaintiff alleges that within two days of her birth, Khaleha had hyperammonemia, high risk sepsis, seizures, respiratory failure, diffuse cerebral edema, and respiratory, cardiovascular, neurological and hematological problems.  Plaintiff also alleges that Khaleha has been diagnosed with mental retardation, and has consistently been diagnosed with developmental delay.  Thus, Plaintiff contends that the ALJ "failed to consider that Khaleha was born with multiple severe birth defects causing permanent impairment in most functional areas.  The ALJ, at a minimum, should have found her to have severe impairment based on multiple body dysfunction, organic mental disorder, mental retardation and developmental disability." Mem. Br. in Supp. of Pl.'s Mot. to Rev. or Remand at 7.

23.    Defendant does not contest the ALJ's step-two determination that Khaleha has an impairment that is severe.  Rather, Defendant's position is that "[s]ubstantial evidence supported the

8

ALJ's step two decision, and it should be affirmed."

24.     Initially, I find that substantial evidence supports the ALJ's finding that Khaleha's urea cycle defect was severe. To be characterized as "severe" for step-two purposes, a child's impairment, or combination of impairments, must be medically determinable, and must cause more than minimal functional limitations. 20 C.F.R. § 416.924(c) (2003). Functional limitations are assessed by looking at whether the claimant does "the things that other children [the claimant's] age typically do or whether [the claimant has] limitations and restrictions because of [his or her] medically determinable impairment(s)." 20 C.F.R. § 416.924a(b)(3) (2003).

25.     There is no dispute that Khaleha was born with a medically determinable condition known as arginine succinate lyase deficiency, or urea cycle defect. **Tr. at 118.** Nor is there any dispute that during the relevant time period, Khaleha had more than minimal functional limitations resulting from her urea cycle defect. Among other things, Khaleha has needed physical therapy as a result of her urea cycle defect to assist her in learning to crawl, sit and walk independently. **Tr. at 32-34, 98-115, 217.** When Khaleha was nearly twenty-months-old, one of her health care providers noted that Khaleha could "crawl and walk a few steps," but was behind in her gross motor skills in that she should have been able to walk well by the time she was fifteen-months-old. **Tr. at 444.** In light of this evidence, the ALJ could reasonably have found that Khaleha's impairment causes more than minimal functional limitations.

26.     With regard to Khaleha's impairments above and beyond urea cycle defect, Plaintiff fails to explain how the ALJ's asserted failure to consider those additional impairments prejudiced Khaleha in any way. The ALJ denied Khaleha benefits at step-three of the disability analysis, not step-two. In fact, at step-two the ALJ found that "[t]he evidence shows that Khaleha has

impairments, which cause more than minimal limitations in age-appropriate functions. [Khaleha], therefore, has a severe impairment." **Tr. at 11.** If the ALJ found that Khaleha did *not* have a severe impairment, she would have been denied benefits at step-two. *See* 20 C.F.R. § 416.924(a) (2003). Because the ALJ found that Khaleha *does* have a severe impairment, he continued to the third step in the analysis.

27.     Moreover, even if the ALJ found at step-two that Khaleha's only severe impairment was urea cycle defect, he was still required to consider Khaleha's other impairments at step-three of the analysis. Applicable regulations required the ALJ to consider Khaleha's impairments separately at step-three as well as to "look comprehensively at the combined effects of [her] impairments on [her] day-to-day functioning." *See* 20 C.F.R. § 416.924a(b)(4) (2003). The ALJ also noted that his analysis at step-three took "into consideration the effect of all of [Khaleha's] impairments, whether mentioned by name specifically or not." **Tr. at 12.** Thus, even if I assume the ALJ should have found that Khaleha's other impairments were severe at step-two, any such error did not operate to deny Khaleha benefits, and would, therefore, have been harmless.

28.     For the foregoing reasons, I find that the ALJ's decision at step-two is supported by substantial evidence and should be affirmed.

### Issue Two: The ALJ's Finding that Khaleha's Impairments Did Not Meet Or Medically Equal A Listed Impairment Is Not Supported By Substantial Evidence, And Remand Is Required To Develop An Adequate Record

29.     Plaintiff also contends that the ALJ erred when he found that Khaleha's impairments did not meet any Listed Impairment. The purpose of the Listings is to describe, "for each of the major body systems, impairments that are considered severe enough to prevent an adult from doing any gainful activity or, for a child, that causes marked and severe functional limitations." 20 C.F.R.

§ 416.925(a) (2003). Plaintiff contends the ALJ should have found that Khaleha met the Listings at

Sections 110.07, 112.02 and 112.05.

Section 110.07

30.    Section 110.07 of the Listings describes the following impairment:

Multiple body dysfunction due to any confirmed (see 110.00B) hereditary, congenital,
or acquired condition with one of the following:
A.    Persistent motor dysfunction as a result of hypotonia and/or musculoskeletal
weakness, postural reaction deficit, abnormal primitive reflexes, or other neurological
impairment as described in 111.00C, and with significant interference with age-
appropriate major daily or personal care activities, which in an infant or young child
includes such activities as head control, swallowing, following, reaching, grasping,
turning, sitting, crawling, walking, taking solids, feeding self; or
B.    Mental impairment as described under the criteria in 112.05 or 112.12; or
C.    Growth impairment as described under the criteria in 100.02A or B; or
D.    Significant interference with communication due to speech, hearing, or visual
impairments as described under the criteria in 102.00 and 111.09; or
E.    Cardiovascular impairments as described under the criteria in 104.00; or
F.    Other impairments such as, but not limited to, malnutrition, hypothyroidism,
or seizures should be evaluated under the criteria in 105.08, 109.02 or 111.02 and
111.03, or the criteria for the affected body system.

31.    There appears to be no dispute that Khaleha satisfies the first prong of Section 110.07,

for she unquestionably has multiple body dysfunction due to a confirmed hereditary and/or congenital

condition.  Urea cycle defect is a hereditary and/or congenital condition that results when a child

inherits defective genes from both parents.  **Tr. at 476.**  The body dysfunction caused by this

condition includes an inability to convert ammonia, which is produced when the body digests protein,

into a non-toxic substance called urea.  **Tr. at 474.**  In addition, high ammonia levels in Khaleha's

blood shortly after her birth damaged her developing brain, and "[b]ecause of this she has been

delayed in attaining developmental milestones and may suffer residual cognitive damage."  **Tr. at 435.**

Because Khaleha has multiple body dysfunction due to a confirmed hereditary and/or congenital

11

condition, the question is whether she also has at least one of the impairments listed at Subsections A through F of Section 110.07. Plaintiff contends that Khaleha's impairment meets the criteria described at Section 110.07, Subsections A, B and D.

<u>Section 110.07, Subsection A</u>

32.     Subsection A of Section 110.07 requires that the claimant have persistent motor dysfunction as a result of hypotonia and/or musculoskeletal weakness, postural reaction deficit, abnormal primitive reflexes or other neurological impairment *and* significant interference with age-appropriate major daily or personal care activities.

33.     With regard to the first requirement for Subsection A, Plaintiff contends that Khaleha has been documented to have persistent motor dysfunction as a result of musculoskeletal weakness. The ALJ concluded that "[t]here is no indication of persistent motor dysfunction as a result of hypotonia and/or musculoskeletal weakness, postural reaction deficit, abnormal primitive reflexes or other neurological impairment." **Tr. at 12.** In reaching this conclusion, the ALJ noted that Khaleha's urea cycle defect was "stable with close monitoring, medication, and diet and cause[s] few functional limitations." **Tr. at 12.** He also noted that "Ms. Clark provided information regarding her daughter's functional limitations noting in some areas that the child was too young to perform certain activities. However, the child did stop crying when picked up and held, looked into the face of the persons talking to her, and essentially responded to stimuli in an appropriate manner." **Tr. at 12.**

34.     I find the ALJ's determination that "[t]here is no indication of persistent motor dysfunction" is not supported by substantial evidence in the record. While I agree that Khaleha's underlying condition - urea cycle defect - appeared to be relatively well-controlled, that did not eliminate all of the adverse physical effects that resulted from the condition. Contrary to the ALJ's

finding, the following evidence establishes that Khaleha exhibited persistent motor dysfunction throughout the relevant time period.

35.    Records of treatment provided by the Texas Tech University Endocrine Clinic on February 22, 2000, when Khaleha was nearly ten-months-old, stated that Khaleha was "slightly delayed in motor function - doesn't sit up or crawl," **Tr. at 153,** but had "good strength, able to grasp," **Tr. at 154.**  Records of treatment provided by Texas Tech Pediatrics on March 31, 2000, when Khaleha was approximately eleven-months-old, stated that Khaleha was "not crawling or standing up," and noted a specific diagnosis of delayed motor development. **Tr. at 411.**  Texas Tech Pediatrics records dated May 25, 2000, when Khaleha was approximately thirteen-months-old, indicated that Khaleha could not crawl and was again diagnosed with "delayed motor and speech development." **Tr. at 406.**  On December 14, 2000, when Khaleha was nearly twenty-months-old, the following note appeared in her records from Northwest Texas Hospital:

> At this time her development is followed by her primary care provider and ETC.  She is able to crawl and walk a few steps, and says approximately 4-5 words such as mama and dada.  Therefore at this time, she is behind in gross motor (should walk well by 15 months).

**Tr. at 444.**

36.    Because Khaleha's medical records consistently indicate that her motor development was delayed, I cannot say that the ALJ's finding that "[t]here is no indication of persistent motor dysfunction" is supported by substantial evidence.

37.    To satisfy the second requirement under Subsection A, a child must also have "significant interference with age-appropriate major daily or personal care activities, which in an infant or young child includes such activities as head control, swallowing, following, reaching,

13

grasping, turning, sitting, crawling, walking, taking solids, feeding self." 20 C.F.R., Part 404,

Appendix 1, §110.07(A). "Significant interference with age-appropriate activities is considered to

exist where the developmental milestone age did not exceed two-thirds of the chronological age at

the time of the evaluation and such interference has lasted or could be expected to last at least 12

months." 20 C.F.R., Part 404, Appendix 1, § 110.00(A)(2).

38.    As to the second requirement under Subsection A, the ALJ found that "the evidence

shows no significant interference with age-appropriate activities," based upon the following:

> At the hearing, Ms. Clark testified that, while her daughter is slow in developing,
> therapy has improved her ability to sit and walk. The Early Childhood Intervention
> Program provides home care services to assist in improving motor skills and everyday
> functioning. The record indicates that improvement in functioning has occurred since
> the referral date of January 27, 2000, through October 31, 2000.

Tr. at 12-13. Thus, the ALJ apparently reasoned that significant interference with Khaleha's age-

appropriate activities could not be expected to last for at least twelve-months because her functioning

had improved.

39.    Evidence in the record indicates that when Khaleha was approximately ten-and-one-

half-months-old, she was on the margins of satisfying the requirement that her developmental

milestone age not exceed two-thirds of her chronological age. A developmental cover sheet from the

Early Childhood Intervention Program ("ECI") dated March 14, 2000 indicates that Khaleha

functioned at the level of an eight-month-old child in gross motor skills, and at the level of a seven-

to eight-month-old child in fine motor skills. Tr. at 112. Two-thirds of her chronological age of ten-

and-one-half-months on that date would have been seven-months of age. Accordingly, Khaleha's

developmental milestone age in fine motor skills appears to have been at or slightly above two-thirds

of her chronological age in March, 2000.

40.     Although the ALJ correctly found that Khaleha's records indicate some improvement in her physical functioning from January 2000 to October 2000, that improvement, in and of itself, was insufficient to find that significant interference with Khaleha's age-appropriate activities could not be expected to last for at least twelve months. In this regard, even if Khaleha's functioning was continually improving, her developmental milestone age may have remained at or below two-thirds of her chronological age. If, despite her improvement, Khaleha's developmental milestone age remained at or below two-thirds of her chronological age, I do not think it would be reasonable to find that the interference with Khaleha's age-appropriate activities could not be expected to last at least twelve months.

41.     Unfortunately, there is no evidence in the record that would indicate how Khaleha's improvement may have affected her developmental milestone age. The record indicates that on March 14, 2000, at the age of ten-and-one-half-months, Khaleha could not pull herself into a standing position, **Tr. at 106,** but could take steps well with her hands held, **Tr. at 113.** Khaleha improved to the extent that she could stand up by herself and remain standing for a few seconds by October 31, 2000, **Tr. at 98,** and by December 14, 2000, when she was nearly twenty-months-old, she could crawl and walk a few steps independently, *see* **Tr. at 444.** However, at the age of twenty-months, Khaleha was still lagging behind other children in that she should have been able to walk well by the time she was fifteen-months-old. **Tr. at 444.** Thus, while Khaleha showed improvement throughout the year in 2000, her developmental milestone age continued to lag behind her chronological age.

42.     A test administered near the time of the hearing before the ALJ could have answered the question of how Khaleha's improvement had affected her developmental milestone age, and the record indicates that such a test may have been administered. In answers to a questionnaire dated

December 22, 2000, Dr. Verna Rose, who was one of Khaleha's treating physicians, stated that Khaleha had an appointment on January 11, 2001 to "test her developmental quotient." **Tr. at 435.** The ALJ was aware that this test had been scheduled, as he noted in his opinion that "to date the test results have not been received." **Tr. at 18.** However, the ALJ made no apparent effort to secure the results of this test despite the fact that "[a]n ALJ has a duty to develop the record by obtaining pertinent, available medical records which come to his attention during the course of the hearing." *Carter v. Chater*, 73 F.3d 1019, 1022 (10th Cir. 1996). I find that the ALJ should have tried to obtain these records, for the results of a developmental quotient test administered in January 2001 would have shown Khaleha's developmental milestone age in relation to her chronological age at that time. By comparing the ECI developmental cover sheet of March 14, 2000 with the results of the January 2001 developmental quotient test, the ALJ could fairly have determined whether the required delay existed, and if it did, whether it could have been expected to last for at least twelve months.

43.     In sum, I find that the ALJ's determination that Khaleha's impairment did not meet Section 110.07, subsection A is not supported by substantial evidence and should be reversed. Because the need for more information is established by the foregoing evidence in the record, I find that the ALJ should make efforts to obtain the results of the developmental quotient test administered in January 2001, and should consider Khaleha's impairment in light of that additional evidence.

### Section 110.07, Subsection B

44.     Subsection B of Section 110.07 requires that the claimant have "[m]ental impairment as described under the criteria in 112.05 or 112.12."

45.     Section 112.05 establishes the criteria for mental retardation. Since the Plaintiff also contends that Khaleha met the criteria for Section 112.05 independent of Section 110.07, I will

16

address Section 112.05 in the discussion below.

46.    Section 112.12 describes the criteria for developmental and emotional disorders of newborn and younger infants (from birth to attainment of age one). Plaintiff contends that "[i]t is likely that Khaleha's condition was also of a severity that met the criteria under Section 112.12." Mem. Br. in Supp. of Mot. to Rev. or Remand at 8. As support, she cites "significant problems" Khaleha exhibited two days after birth, and the fact that within the first year after she was born, she exhibited "a number of developmental delays." However, the Plaintiff concludes her argument by stating, "[l]ittle other actual evaluation appears to have been conducted. It is suspected that since all conditions have now been documented and appear to have arisen from birth that the requirements of this section were probably met although not clearly documented." *Id.*

47.    Section 112.12 was designed to evaluate mental disorders of infants from birth to age one because these children "have not developed sufficient personality differentiation to permit formulation of appropriate diagnoses." 20 C.F.R. part 404, Appendix 1, Section 112.00(C). Other sections of the Listings pertain to children from age one to attainment of age three. *See id.* At the time of the hearing before the ALJ, Khaleha was approximately nineteen-months-old. **Tr. at 28.** Accordingly, I find that it was proper for the ALJ to assess Khaleha's impairments under other Listings that were germane to Khaleha's age at the time of the hearing rather than Section 112.12.

### Section 110.07, Subsection D

48.    Plaintiff contends that the ALJ should have found Khaleha met the criteria for Section 110.07, subsection D, which requires that the claimant have "[s]ignificant interference with communication due to speech, hearing, or visual impairments as described under the criteria in 102.00 and 111.09." The criteria in Section 102.00 pertain to visual and hearing impairments, and are not

17

germane to this case.  Section 111.09 pertains to "[c]ommunication impairment, associated with documented neurological disorder," and, in relevant part, requires one of the following:  "A. Documented speech deficit which significantly affects the clarity and content of the speech; or B. Documented comprehension deficit resulting in ineffective verbal communication for age . . . ."  The ALJ did not address Section 110.07, subsection D in his decision.[2]

49.    In support of her argument pertaining to Khalcha's speech impairment, Plaintiff submitted with her Memorandum Brief a Speech and Language Evaluation Report ("Speech Evaluation") prepared on September 14, 2001, nearly five months after the ALJ rendered his decision. *See* Ex. A to Mem. in Supp. of Pl.'s Mot. to Rev. or Remand.  Plaintiff submits this Speech Evaluation for the first time on appeal to this Court.

50.    In order to remand for consideration of new evidence, the court must ordinarily find that "the new evidence would have changed the [Commissioner's] decision had it been before him." *Hargis v. Sullivan*, 945 F.2d 1482, 1493 (10th Cir. 1991) (citing *Cagle v. Califano*, 638 F.2d 219, 221 (10th Cir. 1981)).  However, where the court remands a case to the Commissioner for further evaluation of other issues, it is appropriate to allow the Commissioner to determine whether the newly submitted evidence would "significantly alter his initial determination." *See id.*  If so, the Commissioner may evaluate a claimant's impairments in light of the additional evidence submitted on appeal. *See id.*

---

[2]It appears that the issue of impairment under Section 110.07, subsection D was not raised at the hearing before the ALJ or in Plaintiff's request for review with the Appeals Council.  However, the U.S. Supreme Court has held that a social security claimant is not required to raise issues at the administrative level in order to preserve judicial review of those issues. *Sims v. Apfel*, 530 U.S. 103 (2000).  Although *Sims* was a plurality opinion, a majority of five Justices concluded that issue exhaustion is not required to obtain judicial review.

51.     Because I find that this case should be remanded to the Commissioner for further consideration of the issues of impairment under Section 110.07(A) and 112.05, I find that the Commissioner should also decide whether Plaintiff's Speech and Language Evaluation Report would have altered the initial determination. If so, in accordance with *Hargis v. Sullivan,* I find that the Commissioner should also consider Khaleha's impairments in light of Plaintiff's Speech and Language Evaluation Report.

Section 112.02

52.     Plaintiff also contends that the ALJ should have found that Khaleha meets the criteria for Section 112.02. As was the case with Section 110.07, subsection D, it appears that impairment under Section 112.02 was not raised at the hearing before the ALJ, and the ALJ did not address Section 112.02 in his decision.

53.     Section 112.02 of the Listings describes the required criteria for impairments based on organic mental disorders. The introductory statement for this Listing describes the disorder as follows:

> Abnormalities in perception, cognition, affect, or behavior associated with dysfunction of the brain. The history and physical examination or laboratory tests, including psychological or neuropsychological tests, demonstrate or support the presence of an organic factor judged to be etiologically related to the abnormal mental state and associated deficit or loss of specific cognitive abilities, or affective changes, or loss of previously acquired functional abilities.

In order to meet or medically equal the Listing at Section 112.02, a claimant must satisfy part A and part B of the Listing.

54.     Before proceeding to parts A and B of Section 112.02, however, the ALJ was required to determine whether Khaleha's impairment fell within the description indicated by the

introductory statement. In explaining how the Listings for mental disorders should be applied, the regulations state:

> The purpose of the criteria in paragraph A is to substantiate medically the presence of a particular mental disorder. *Specific symptoms and signs under any of the listings 112.02 through 112.12 cannot be considered in isolation from the description of the mental disorder contained at the beginning of each listing category.* Impairments should be analyzed or reviewed under the mental category(ies) indicated by the medical findings.

20 C.F.R. Part 404, Appendix 1, § 112.00 (emphasis added).

55.     Although the Plaintiff argues that Khaleha's impairment satisfies both part A and part B of Section 112.02, I find that she has failed to show that Khaleha's impairment falls within the description of the mental disorder contained in the introductory statement. In this regard, I find no evidence in the record that indicates that Khaleha showed signs of "[a]bnormalities in perception, cognition, affect or behavior associated with dysfunction of the brain."

56.     Accordingly, I find that it was proper for the ALJ to consider Khaleha's impairment under Section 112.05 rather than Section 112.02.

### Section 112.05

57.     Section 112.05 of the Listings describes the criteria for mental retardation, "[c]haracterized by significantly subaverage general intellectual functioning with deficits in adaptive functioning." With regard to whether Khaleha satisfied the requirements for Section 112.05, the parties dispute the meaning of opinions expressed by one of Khaleha's treating physicians, Dr. Verna Rose. In a letter dated September 25, 2000, Dr. Rose wrote:

> [Khaleha] is handicapped because of mental retardation due to a metabolic disorder, argininosuccinic aciduria. Argininosuccinic aciduria is due to a deficiency of the enzyme arginine succinate lyase. Because of the deficiency of this enzyme, she is at risk for elevated ammonia levels that can cause further damage to her brain if not

20

controlled.   Treatment for this disorder is a life long diet low in protein, and supplementation with arginine and a medical food product.

*She has mental retardation because of this disorder.*  Since this disorder will persist for life, she will continue to require services such as physical therapy, occupational therapy, and speech therapy.

**Tr. at 217 (emphasis added).**  Subsequently, in answers to a questionnaire dated December 22,

2000, Dr. Rose wrote, in pertinent part:

1. Argininosuccinic aciduria causes elevated ammonia levels which damage the brain and can result in coma and death.  [Khaleha's] ammonia level of 860 after birth damaged her developing brain.  Because of this she has been delayed in attaining developmental milestones and may suffer residual cognitive damage.
2. *All individuals with this disorder have some degree of mental retardation, most usually severe to profound.  Due to the fact that [Khaleha] is less than 3 years of age, I should have stated that she is developmentally delayed.*  We have scheduled an appointment on January 11, 2001 at 9:00 a.m. with Dr. Lenora Andrew to test her developmental quotient.
3. Lack of arginine succinate lyase results in build up of toxic metabolites that damage the brain.  She is at risk for additional cognitive damage if diet and medication do not control her levels.

**Tr. at 435 (emphasis added).**

58.    The ALJ based his finding that Khaleha did not meet the criteria for mental retardation

under Section 112.05 on the following.  First, the ALJ read the foregoing statements by Dr. Rose to

mean that Dr. Rose had *amended* her earlier diagnosis of mental retardation to a diagnosis of

developmental delay.  **Tr. at 13.**  Second, the ALJ noted that no evaluation or test results confirmed

an impairment that satisfies Section 112.05 in the record.  **Tr. at 13.**  And third, the ALJ read the

developmental cover sheet from the ECI as containing findings that, at ten-and-one-half-months of

age, Khaleha "functioned at a near age appropriate manner."  **Tr. at 13 (construing Tr. at 112).**

59.    In order to find that Dr. Rose "amended" her earlier diagnosis of mental retardation

to a diagnosis of developmental delay, the ALJ necessarily ignored Dr. Rose's statement that "*[a]ll*

21

individuals with this disorder have some degree of mental retardation, most usually severe to profound." **Tr. at 435 (emphasis added).** The ALJ was not free to simply disregard this statement by Khaleha's treating physician, *see Briggs v. Massanari*, 248 F.3d 1235, 1238 (10th Cir. 2001), for it clearly indicates that Khaleha does have mental retardation. The question, therefore, is whether Khaleha's mental retardation was severe enough to satisfy the specific measures of intellectual functioning required by Section 112.05.[3]

60.    The ALJ could not properly deny Khaleha's claim based upon an absence of evidence confirming that her impairment satisfied Section 112.05. It is true that the claimant in a social security case bears the burden of proving disability. *Hawkins v. Chater*, 113 F.3d 1162, 1164 (10th Cir. 1997). However, because social security proceedings are nonadversarial, the ALJ is responsible

---

[3]The required level of severity for Section 112.05 is met when the requirements under subsection A, B, C, D, E, or F are satisfied. Those subsections provide, in pertinent part:

A.    For older infants and toddlers (age 1 to attainment of age 3), resulting in at least one of the appropriate age-group criteria in paragraph B1 of 112.02 . . . .; OR

B.    Mental incapacity evidenced by dependence upon others for personal needs (grossly in excess of age-appropriate dependence) and inability to follow directions such that use of standardized measures of intellectual functioning is precluded; OR

C.    A valid verbal, performance, or full scale IQ of 59 or less; OR

D.    A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant limitation of function; OR

E. .   A valid verbal, performance, or full scale IQ of 60 through 70 and:

1.    For older infants and toddlers (age 1 to attainment of age 3), resulting in attainment of development or function generally acquired by children no more than two-thirds of the child's chronological age in either paragraphs B1a or B1c of 112.02; . . . .; OR

F. .   Select the appropriate age group:

1. .   For older infants and toddlers (age 1 to attainment of age 3), resulting in attainment of development or function generally acquired by children no more than two-thirds of the child's chronological age in paragraph B1b of 112.02, and a physical or other mental impairment imposing an additional and significant limitation of function . . . .

22

in every case "to ensure that an adequate record is developed during the disability hearing consistent with the issues raised." *Id.* (quoting *Henrie v. Dep't of Health & Human Servs.*, 13 F.3d 359, 360-61 (10th Cir. 1993)). Where objective evidence in the record indicates "the existence of a condition which could have a material impact on the disability decision requiring further investigation," and further examination would be necessary or helpful to resolve the issue of impairment, the ALJ should order a consultative examination. *Id.* at 1167.

61.     In this case, a statement by Khaleha's treating physician indicates that Khaleha has mental retardation. In light of this objective evidence, I find that the ALJ had a duty to attempt to secure pertinent medical records that came to his attention during the hearing that would assist him in determining whether Khaleha's mental impairment was severe enough to satisfy Section 112.05. *See Carter v. Chater*, 73 F.3d 1019, 1022 (10th Cir. 1996). In the alternative, I find that the ALJ had a duty to order a consultative examination if such an examination would have been necessary or helpful in resolving the issue of impairment under Section 112.05. *See Hawkins*, 113 F.3d at 1164.

62.     In this case, the results of the developmental quotient test that was scheduled for January 11, 2001 (referred to above in the discussion of Section 110.07, subsection A) may well have provided sufficient information for the ALJ to determine whether Khaleha satisfied the measures of intellectual functioning required by Section 112.05. Accordingly, I find that the ALJ should make efforts to obtain the results of the developmental quotient test administered in January 2001. The ALJ should then consider the issue of impairment under Section 112.05 in light of that additional evidence. If the results of such a test are not available, or if they do not provide sufficient information to make a determination, the ALJ should order a consultative examination to assist in deciding whether Khaleha met the requirements for an impairment under Section 112.05.

**Issue Three:  The ALJ's Finding That Khaleha's Impairments Did Not
Functionally Equal A Listed Impairment Is Not Supported By Substantial
Evidence, And May Need To Be Reconsidered In Light Of Additional Evidence**

63.    Six domains of functioning are assessed in determining whether a child's impairment

functionally equals a Listed Impairment. 20 C.F.R. § 416.926a(b)(1)( 2003). To "functionally equal"

a Listed Impairment, a child's impairments must result in an "extreme" limitation in one domain of

functioning, or must result in "marked" limitations in two domains of functioning.  20 C.F.R. §

416.926a (2003).  The regulations define a "marked" limitation as follows:

> (i)  We will find that you have a "marked" limitation in a domain when your
> impairment(s) interferes seriously with your ability to independently initiate, sustain,
> or complete activities.  Your day-to-day functioning may be seriously limited when
> your impairment(s) limit several activities.  "Marked" limitation also means a
> limitation that is "more than moderate" but "less than extreme."  It is the equivalent
> of the functioning we would expect to find on standardized testing with scores that
> are at least two, but less than three, standard deviations below the mean.
> (ii)   If you have not attained age 3, we will generally find that you have a
> "marked"limitation if you are functioning at a level that is more than one-half but not
> more than two-thirds of your chronological age when there are no standard scores
> from standardized tests in your case record.
> (iii)  If you are a child of any age (birth to the attainment of age 18), we will find that
> you have a "marked" limitation when you have a valid score that is two standard
> deviations or more below the mean, but less than three standard deviations, on a
> comprehensive standardized test designed to measure ability or functioning in that
> domain, and your day-to-day functioning in domain-related activities is consistent
> with that score.

20 C.F.R. § 416.926a(e)(2) (2003).  The regulations define an "extreme" limitation as follows:

> (i)  We will find that you have an "extreme" limitation in a domain when your
> impairment(s) interferes very seriously with your ability to independently initiate,
> sustain, or complete activities.  Your day-to-day functioning may be very seriously
> limited when your impairment(s) limits only one activity or when the interactive and
> cumulative effects of your impairment(s) limit several activities.  "Extreme" limitation
> also means a limitation that is "more than marked."  "Extreme" limitation is the rating
> we give to the worst limitations.  However, "extreme limitation" does not necessarily
> mean a total lack or loss of ability to function.  It is the equivalent of the functioning
> we would expect to find on standardized testing with scores that are at least three

24

standard deviations below the norm.

(ii) If you have not attained age 3, we will generally find that you have an "extreme" limitation if you are functioning at a level that is one-half of your chronological age or less when there are no standard scores from standardized tests in your case record.

(iii) If you are a child of any age (birth to the attainment of age 18), we will find that you have an "extreme" limitation when you have a valid score that is three standard deviations or more below the mean on a comprehensive standardized test designed to measure ability or functioning in that domain, and your day-to-day functioning in domain-related activities is consistent with that score.

20 C.F.R. § 416.926a(e)(3) (2003).

64.    Plaintiff contends that the ALJ should have found that Khaleha has a marked to extreme impairment in the domains of functioning of acquiring and using information, and moving about and manipulating objects. *See* 20 C.F.R. § 416.926a(b)(1) (2003).

65.    With regard to the domain of functioning concerned with acquiring and using information, the ALJ found that "[t]here is no indication in the record of a mental impairment or serious mental [or] emotional dysfunction." **Tr. at 15.** However, as discussed above with regard to Section 112.05, the ALJ could only have found Khaleha did not have a mental impairment by ignoring Khaleha's treating physician's statement that "*[a]ll* individuals with [urea cycle defect] have some degree of mental retardation, most usually severe to profound." **Tr. at 435 (emphasis added).**

66.    With regard to the domain of functioning concerned with moving about and manipulating objects, the ALJ found that Khaleha exhibited "less than marked limitation in this area." **Tr. at 16.** Although it is not entirely clear, the ALJ's decision appears to be based on the fact that Khaleha was improving and learning to walk. However, for the reasons addressed above in the discussion of Section 110.07, subsection A, more information is needed to properly evaluate Khaleha's ability to function in these domains.

67.    If the Commissioner determines, on remand, that Khaleha's impairments meet or

medically equal a Listed Impairment, analysis of whether Khaleha's impairments functionally equal a Listed Impairment will not be required. If, on the other hand, the Commissioner finds that Khaleha's impairments do not meet or medically equal any Listed Impairment, the additional evidence ordered should also provide information that would be helpful in determining whether Khaleha's impairments functionally equal a Listed Impairment. Accordingly, if the Commissioner determines that Khaleha's impairments do not meet or medically equal any Listed Impairment, the Commissioner should assess functional equivalence in light of the additional evidence.

### Conclusion and Summary

68.     In sum, I find that the ALJ's determination that Khaleha's impairment did not meet or medically equal a Listed Impairment was not supported by substantial evidence and should be reversed. I also find that the ALJ's determination that Khaleha's impairments did not functionally equal a Listed Impairment is not supported by substantial evidence and should be reversed.

69.     Where a decision by the Commissioner is reversed, this Court has discretion to remand the case for further administrative proceedings or to order an immediate award of benefits. *Ragland v. Shalala*, 992 F.2d 1056, 1060.(10th Cir. 1993). Because I do not think the evidence presently in the record is sufficient to decide whether Khaleha met the requirements for benefits, I find that remand for further administrative proceedings is appropriate.

70.     On remand, the Commissioner should further develop the record as to the issues of whether Khaleha met the requirements for the Listings at Sections 110.07(A) and 112.05. Specifically, the Commissioner should make efforts to obtain records of a developmental quotient test that was scheduled to occur on January 11, 2001 and any other similar test that may have been administered.

71.     The Commissioner should also determine whether the Plaintiff's Speech and Language Evaluation Report prepared on September 14, 2001 and submitted with Plaintiff's Memorandum Brief would have changed his decision.  If so, the Commissioner should also consider that evidence in deciding whether Khaleha's impairments met or medically equaled a Listed Impairment.

72.     If records of the identified developmental quotient test or similar assessment are not available, or if such records do not provide sufficient information to determine whether Khaleha's impairment met or medically equaled a Listed Impairment, the Commissioner should order a consultative examination to determine whether Khaleha met the requirements for a Listed Impairment in accordance with this opinion.

73.     If, after considering the evidence described herein the Commissioner determines that Khaleha's impairment does not meet or medically equal a Listed Impairment, the Commissioner should consider that additional evidence in determining whether Khaleha's impairment functionally equals a Listed Impairment.

## RECOMMENDED DISPOSITION

For the foregoing reasons, I recommend that Plaintiff's Motion to Reverse or Remand the Administrative Agency Decision [docket # 7] be GRANTED IN PART.

Within ten (10) days after a party is served with a copy of these proposed findings and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such proposed findings and recommendations.  A party must file any objections within the ten (10) day period if that party seeks appellate review of the proposed findings and recommendations.  If no objections are filed, no appellate review will be allowed.

W. DANIEL SCHNEIDER
UNITED STATES MAGISTRATE JUDGE